UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| CARRIE STRAWS, | CASE NO. C19-6178 BHS |
| Plaintiff, | |
| v. | ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |
| CARLOS DEL TORO, Secretary of the Navy,[1] | |
| Defendant. | |

This matter comes before the Court on Defendant Carlos Del Toro's, Secretary of the Navy, ("the Navy") motion for summary judgment. Dkt. 12. The Court has considered the briefings filed in support of and in opposition to the motion and the remainder of the file and hereby grants the motion for the reasons stated herein.

## I.   FACTUAL & PROCEDURAL BACKGROUND

Plaintiff Carrie Straws has worked at the Puget Sound Naval Shipyard since January 2015 and, throughout the relevant time period, as a Marine Machinery Mechanic Apprentice. Dkt. 13-1, Deposition of Carrie Straws ("Straws Dep."), at 13:4–8; 21:10–12.

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), the Court substitutes Carlos Del Toro, Secretary of the Navy, as the appropriate defendant.

1   She brings claims against the Navy for discrimination based on disability, record of

2   disability, and perception of disability in violation of the Rehabilitation Act of 1973, 29

3   U.S.C. § 701, *et seq.*, including allegations of a hostile work environment, and for

4   retaliation in violation of the Rehabilitation Act. Dkt. 1 at 6–10.

5          Straws worked in Shop 38, performing mechanical maintenance and repairs to the

6   Navy's submarines and aircraft carriers. *See* Dkt. 15, Declaration of Steven Martinsen,

7   ¶ 3. As a Marine Machinery Mechanic Apprentice, Straws was required to perform

8   physically demanding tasks inside and outside of buildings at the Shipyard, aboard

9   surface ships, and on submarines at pier side or in dry dock. Dkt. 14, Declaration of

10  Benjamin Godsey ("Godsey Decl."), ¶ 3. The role demands ascending and descending

11  vertical and inclined ladders, carrying and setting up installations and equipment that

12  occasionally weighed 60 pounds or greater, and working at various levels of elevation,

13  among others. *Id.*

14         Given the physical demands of the Marine Machinery Mechanic Apprentice

15  position, Straws underwent a fitness-for-duty exam prior to commencing work with the

16  Navy. Straws Dep. at 19:15–20:7; *see also* 5 C.F.R. § 339.301(a) (authorizing routine

17  pre-employment medical examinations for positions with physical requirements). Straws

18  was cleared for work without limitation on October 29, 2014, *see* Dkt. 13-2 at 10–15,

19  began working at the shipyard on or about January 5, 2015, Straws Dep. at 21:10–12, and

20  started with the apprenticeship program in July 2015, Godsey Decl., ¶ 2.

21         Straws was diagnosed with epilepsy, a seizure disorder, when she was a child.

22  Straws Dep. at 24:1–10. At her deposition in April 2021, Straws testified that she could

1  not recall the last time that she had a seizure but that, prior to having a seizure, she

2  experiences dizziness, tunnel vision, muffled hearing, and loss of strength. *Id.* at 26:1–

3  27:5. Straws also has been informed by her doctor that she has hypoglycemic tendencies,

4  although she has never been diagnosed with hypoglycemia. *Id.* at 28:11–19. These

5  hypoglycemic tendencies result in near syncope (i.e., fainting or passing out), shakiness,

6  lightheadedness, and a loss of energy. *Id.* at 29:2–7. She testified at her deposition that

7  she could not remember if she had suffered from these symptoms since 2018. *Id.* at 29:8–

8  13. Straws has never requested a reasonable accommodation from the Navy to perform

9  her duties. Dkt. 1, ¶ 4.6.

10       On or about September 26, 2017, Straws was working in the propellor shop at the

11  Shipyard, stood up to walk to another office, lost control of her legs, and appeared to

12  have blacked out. Straws Dep. at 79:21–80:20. Straws's co-worker caught her as she was

13  falling, and the paramedics were called. *Id.* at 80:21–81:1. Straws was then instructed to

14  report to the Dispensary to confirm if she was okay to work and did so on September 26,

15  2017. *Id.* at 83:5–25; *see also* Dkt. 13-2 at 5. The Dispensary's records indicate that

16  Straws was seen for the fall occurring as a result of a seizure, that she was placed on

17  permanent fall/incapacitation work limitations, and that she was advised to see her

18  primary medical doctor to discuss work limitations. Dkt. 13-2 at 5. Straws was then seen

19  again by the Dispensary on September 29, 2017 and was returned to full duty. *Id.* at 6.

20  The records indicate that Straws's primary medical doctor believed the syncopal event

21  was due to other factors—not her epilepsy. *Id.*

22

1    Approximately six months later, on or about February 13, 2018, Straws

2  experienced another syncopal event while working aboard a ship. Straws Dep. at 87:4–9.

3  Straws testified that she felt like she was going to pass out and told her co-workers that

4  she needed to lie down. *Id.* at 87:12–25. She further testified that she lost strength in her

5  legs and could not open her eyes. *Id.* Her co-workers lowered her to the deck and called

6  the paramedics. *Id.* at 88:1–3. Straws was again asked to report to the Dispensary after

7  this event and did so on February 13, 2018. Dkt. 13-2 at 3. She was placed on temporary

8  limits until she could follow up with her primary medical doctor. *Id.* Straws returned to

9  the Dispensary the next day, February 14, 2018, and Dispensary physician reviewed a

10  note from her primary medical doctor stating that Straws might have hypoglycemic

11  events and recommending that she take nutrition breaks. *Id.* Straws was returned to full

12  duty that same day. *Id.*

13    Then, on July 9, 2018, Straws had an additional syncopal event while aboard the

14  U.S.S. Nimitz, an aircraft carrier. Straws Dep. at 123:23–124:8. Her co-workers

15  witnessed Straws walking unsteadily, almost walking into items on the flight deck,

16  stating that her head hurt, and moving from sitting position to a prone position with her

17  eyes closed. *Id.* Straws testified that she suffered from heat stress that day and felt overly

18  hot but cold at the same time, felt weak, and was slurring her words. *Id.* at 36:9–20.

19  Straws was seen at the Dispensary on August 6, 2018 in regard to the July 9, 2018 event.

20  Dkt .13-2 at 2. The Dispensary records indicate that Straws told the Dispensary physician

21  that it was hot that day, that she was dehydrated, and that she felt faint. *Id.* The

22  Dispensary physician noted that Straws did not have a medical evaluation on July 9 and

1    that she was cleared by her primary medical doctor for full work. *Id.* Straws was

2    determined fit for duty. *Id.*

3         Following these syncopal events, on September 11, 2018, Benjamin Godsey—the

4    Marine Machinery Mechanic Trade Superintendent for Shop 38—issued a letter to

5    Straws requesting that she obtain a fitness-for-duty exam pursuant to 5 C.F.R. § 339.301.

6    Dkt. 14-1. The letter expressed concerns with Straws's ability to safely work and with her

7    medical limitations as they related to her position. *Id.* The letter further directed Straws to

8    obtain an examination from her personal medical doctor within fifteen days of the

9    issuance of the letter. *Id.* The Navy asserts that, after issuing the September 11 letter,

10   Godsey became aware that the Navy would not be able to reimburse an outside physician

11   for Straws's exam. Dkt 12 at 6. Godsey then rescinded the September 11 letter on

12   November 2, 2018, Dkt. 14-2, and issued a new fitness-for-duty letter that same day,

13   indicating that Straws was scheduled for an exam at the Dispensary on November 16,

14   2018, Dkt. 14-3. The November fitness-for-duty letter instructed Straws to bring the letter

15   with all attachments and enclosures, including a completed DD Form 2807-1, to

16   Dispensary doctor Dr. Uniskiewicz by close of business November 9, 2018. *Id.*

17        The Navy asserts that Straws failed to follow instructions and provide the required

18   information to Dr. Uniskiewicz by the November 9 deadline. Dkt. 14-4. Godsey then

19   issued an amendment to the November 2 letter and rescheduled Straws's appointment to

20   November 30, 2018. *Id.* Godsey declares that, though the November 18 letter states that

21   Straws failed to follow instructions, the letter was not a disciplinary action and was not

22   recorded or filed in Straws's personnel file as discipline. Godsey Decl., ¶ 8.

1    Straws reported to her fitness-for-duty exam on November 30, 2018. Straws Dep.

2    at 133:20–24. The Navy asserts that Dr. Christensen, the Dispensary doctor, was unable

3    to complete the fitness-for-duty paperwork because information was needed from

4    Straws's primary medical doctor who treats her for epilepsy. *Id.* at 65:19–66:5; 69:16–25;

5    *see also* Godsey Decl., ¶ 9. The Navy further asserts that onus was on Straws to follow

6    up with her primary medical doctor to complete her fitness-for-duty paperwork and that,

7    despite the fact that Dr. Christensen was unable to complete the paperwork on November

8    30, 2018, Straws continued to work full time without restrictions. Dkt. 12 at 7; *see also*

9    Straws Dep. at 72:17–73:4. Godsey understood Straws to be cleared for duty and declares

10   that he never considered her to be unfit for duty. Godsey Decl., ¶¶ 11, 13, 15. Indeed,

11   Straws graduated from the Marine Machinery Mechanic Apprentice program in October

12   2019 and is currently a Journeyman Marine Machine Mechanic. *Id.* ¶ 2.

13        Straws argues that the Navy ordered the fitness-for-duty exam after the July 2018

14   syncopal event in order to avoid a charge from Straws's union over safety violations. *See,*

15   *e.g.*, Dkt. 18 at 8–9. She asserts that the air conditioning in the break rooms had

16   malfunctioned and that the crane which was used to transport drinking water on the deck

17   was inoperable. *Id.* at 2. Straws argues that the Navy attempted to blame her syncope on

18   July 9, 2018 on her epilepsy as pretext for the unsafe working conditions. As a result of

19   the fitness-for-duty exam, Straws asserts that a large red folder was placed in her medical

20   file and that the Navy has not rescinded the fitness-for-duty requirement. *Id.* at 6–7.

21        Straws contacted an EEO counselor on September 12, 2018, alleging that she was

22   being discriminated against based on her disability and filed a formal EEO complaint on

1   December 3, 2018. Dkt. 17, ¶¶ 2–3. She filed the instant case on December 8, 2019,

2   alleging that requiring her to report for multiple fitness-for-duty evaluations and

3   maintaining her as unfit for duty has subjected her to a hostile work environment. Dkt. 1,

4   ¶¶ 5.7–5.8. She also alleges that she was retaliated against when she was required to

5   submit to a fitness-for-duty medical evaluation, among other allegations of retaliation.[2]

6   *Id.* ¶ 6.3.

7          On June 9, 2021, the Navy moved for summary judgment on all of Straws' claims.

8   Dkt. 12. On June 28, 2021, Straws responded. Dkt. 18. On July 2, 2021, the Navy replied.

9   Dkt. 21.

10                        **II.   DISCUSSION**

11         The Navy moves for summary judgment, arguing that Straws cannot establish a

12  hostile work environment claim under the Rehabilitation Act, that its efforts to determine

13  her fitness-for-duty were reasonable and not disability-based harassment, and that she

14  cannot establish a prima facie case of retaliation.

15  **A.     Summary Judgment Standard**

16         Summary judgment is proper only if the pleadings, the discovery and disclosure

17  materials on file, and any affidavits show that there is no genuine issue as to any material

18

19         [2] Straws alleges that the Navy took adverse actions against her by issuing a written notice
20  accusing her of failing to follow instructions, denying her application for a temporary duty travel
    ("TDY") assignment, knowingly submitting false information during the EEO investigation by
21  stating it was unaware of her epilepsy, requiring her to submit to a evaluation without cause,
    refusing to issue or allow its medical professional employees to issue a notice that she is fit for
22  duty, and engaging in a pattern of employment actions that exposed her to a hostile work
    environment. Dkt. 1, ¶ 6.3.

1    fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

2    The moving party is entitled to judgment as a matter of law when the nonmoving party

3    fails to make a sufficient showing on an essential element of a claim in the case on which

4    the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

5    (1986). There is no genuine issue of fact for trial where the record, taken as a whole,

6    could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec.*

7    *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must

8    present specific, significant probative evidence, not simply "some metaphysical doubt").

9    Conversely, a genuine dispute over a material fact exists if there is sufficient evidence

10   supporting the claimed factual dispute, requiring a judge or jury to resolve the differing

11   versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W.*

12   *Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

13        The determination of the existence of a material fact is often a close question. The

14   Court must consider the substantive evidentiary burden that the nonmoving party must

15   meet at trial—e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477

16   U.S. at 253–54; *T.W. Elec. Serv., Inc.*, 809 F.2d at 631. The Court must resolve any

17   factual issues of controversy in favor of the nonmoving party only when the facts

18   specifically attested by that party contradict facts specifically attested by the moving

19   party. The nonmoving party may not merely state that it will discredit the moving party's

20   evidence at trial, in the hopes that evidence can be developed at trial to support the claim.

21   *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255).

22

1    Conclusory, nonspecific statements in affidavits are not sufficient, and missing facts will

2    not be presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990).

3    **B.    Discrimination Claims**

4         The Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*, and ADA case

5    law provide the substantive law for Rehabilitation Act claims. *See, e.g.*, *Newland v.*

6    *Dalton*, 81 F.3d 904, 906 (9th Cir. 1996) (citing 29 U.S.C. § 791(g)). It is well-settled

7    that "there is no significant difference in the analysis of rights and obligations created by

8    the two Acts." *Vinson v. Thomas*, 288 F.3d 1145, 1152 n.7 (9th Cir. 2002); *see also* 42

9    U.S.C. § 12133 (a portion of the ADA, stating that "[t]he remedies, procedures, and

10   rights set forth in [the Rehabilitation Act] shall be the remedies, procedures, and rights

11   [applicable to ADA claims]"); *Bragdon v. Abbott*, 524 U.S. 624, 632 (1998) (stating that

12   courts are required to "construe the ADA to grant at least as much protection as provided

13   by the regulations implementing the Rehabilitation Act"). Straws alleges that the Navy

14   subjected her to a hostile work environment and discriminated against her on the basis of

15   her disability.

16        **1.    Hostile Work Environment**

17        Neither the Ninth Circuit nor the Supreme Court has expressly held that there is a

18   claim for a hostile work environment or for harassment based on disability discrimination

19   under the ADA. Nonetheless, the Ninth Circuit has assumed without deciding that such a

20   claim exists. *See Garity v. APWU Nat'l Labor Org.*, 655 Fed. App'x 523, 524 (9th Cir.

21   2016). The Navy assumes without conceding that the Ninth Circuit would recognize

22   Straws's hostile work environment under the Rehabilitation Act here. Dkt. 12 at 10.

1    District courts within the Ninth Circuit apply the Title VII standard to ADA

2    hostile work environment claims. *See, e.g.*, *Rood v. Umatilla Cnty.*, 526 F. Supp. 2d

3    1164, 1176 (D. Or. 2007). To establish a prima facie case of disability-based hostile work

4    environment, a plaintiff must show that (1) she has a disability; (2) she was subjected

5    unwelcome harassment; (3) the harassment was based on her disability; (4) the

6    harassment was sufficiently severe or pervasive to alter the conditions of employment

7    and to create an abusive working environment; and (5) the employer knew or should have

8    known about the harassment and failed to take prompt action to stop it. *Northrop v.*

9    *Safeway, Inc.*, No. C16-350 TSZ, 2017 WL 1543331, at *2 (W.D. Wash. Apr. 28, 2017);

10   *see also Flowers v. S. Reg'l Physician Servs., Inc.*, 247 F.3d 229, 235–36 (5th Cir. 2001)

11   (explicitly adopting the Title VII standard for disability-based harassment claims).

12   The parties dispute whether Straws was subject to unwelcome harassment. Straws

13   argues that the Navy's "insistence" on making her take a fitness-for-duty exam has been

14   relentless and continuous since September 2018. Dkt. 18 at 16. But the Court agrees with

15   the Navy that Straws has failed to show harassment, let alone harassment that was

16   sufficiently severe or pervasive.

17   A plaintiff must prove that her workplace was "both objectively and subjectively

18   offensive, one that a reasonable person would find hostile or abusive, and one that the

19   victim in fact did perceive to be so." *Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864,

20   871–72 (9th Cir. 2001). Courts consider the totality of the circumstances, including "the

21   frequency of the discriminatory conduct; its severity; whether it is physically threatening

22

1    or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with

2    an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

3         Straws has not provided sufficient, non-speculative evidence that she was

4    subjected to a discriminatorily hostile or abusive environment. She testified at her

5    deposition that she does not recall anyone referencing her epilepsy when she was asked to

6    report to the Dispensary, and she was unable to recall any derogatory remarks made

7    about her medical conditions. *See* Straws Dep. at 86:19–87:3; 94:3–20; 220:1–18. The

8    Navy sent her four letters regarding the fitness-for-duty exam following her syncopal

9    incidents in July 2018. Notably, the fitness-for-duty exam was scheduled pursuant to 5

10   C.F.R. § 339.301(b)(3) and was regulatorily authorized. Straws has not provided any case

11   law to support that these letters scheduling and rescheduling the exam rise to the level of

12   a hostile work environment. And Straws has not provided support to establish harassment

13   in relation to her argument that a red folder remains in her medical file and that she is still

14   required to undergo a fitness-for-duty exam.[3] The alleged conduct also falls far short of

15   the severe, pervasive harassment needed to support a hostile work environment claim. *Cf.*

16   *Northrop*, 2017 WL 1543331, at *3 (holding multiple instances of name calling and

17   aspersions to plaintiff's mental acuity were not objectively hostile). In sum, viewing the

18   evidence in the light most favorable to Straws, a reasonable person would not find the

19   Navy's behavior to be hostile or abusive.

20

21

22         [3] Straws also argues this action by the Navy is pretext, which is discussed below.

1    Therefore, the Navy's motion for summary judgment is GRANTED, and Straws's

2    hostile work environment claim is DISMISSED with prejudice.

3        **2.    Disability Discrimination**

4        Straws also argues that the Navy's request that she obtain a fitness-for-duty exam

5    in 2018 amounts to disability discrimination. Dkt. 18 at 8–13. While the Navy argues that

6    these claims are new and unexhausted, *see* Dkt. 21 at 4, it appears to the Court that

7    Straws raised this argument in her formal EEO complaint, *see* Dkt. 17-2. To establish a

8    prima facie case of discrimination under the ADA, a plaintiff must show that she: (1) is

9    disabled; (2) is qualified; and (3) suffered an adverse employment action because of her

10   disability. *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1087 (9th Cir. 2001)

11   (internal citation omitted). The Navy appears to concede that Straws is disabled and

12   qualified but disputes that she suffered an adverse employment action because of her

13   disability. Dkt. 21 at 4–8.

14       Straws's theory appears to be that she suffered an adverse employment action: (1)

15   when the Navy ordered her to undergo a fitness-for-duty exam after the July 2018

16   syncopal incident; (2) when the exam was rescheduled in November 2018; (3) due to the

17   fact that a red folder remains in her medical file; and (4) due to her allegation that she is

18   still under a requirement to complete the fitness-for-duty exam. Dkt. 18 at 8–13. She

19   additionally argues that the 2018 fitness-for-duty exam is pretext for retaliation against

20   her for reporting to her union the working conditions in July 2018. *Id.* at 11–13.

21       First, on its face, the fitness-for-duty exam was a legitimate request by the Navy

22   pursuant to 5 C.F.R. § 339.301(b)(3) and given Straws's history of syncope. Moreover,

1    like her hostile work environment claim, Straws fails to provide case law or non-

2    speculative evidence to support her argument that this series of events is an adverse

3    action. Straws's supervisor understood her to be fit for duty although the fitness-for-duty

4    exam was technically unresolved. She successfully graduated from the apprenticeship

5    program, and there was no impact on her pay or work because of the exam requirement.

6    It appears there was a miscommunication between the Navy and Straws on how to

7    resolve the fitness-for-duty exam, but ultimately, and viewing the evidence in the light

8    most favorable to Straws, there was no adverse impact on her employment because of the

9    exam.

10          Furthermore, the Court agrees with the Navy that Straws has not presented

11   sufficient evidence demonstrating pretext. Pretext can be established by showing "that a

12   discriminatory reason more likely motivated the employer" or "that the employer's

13   proffered explanation is unworthy of credence." *Tex. Dep't of Cmty. Affs. v. Burdine*, 450

14   U.S. 248, 256 (1981). A plaintiff may rely on direct evidence which proves

15   discriminatory animus on its own—typically clearly discriminatory statements or

16   actions—or circumstantial evidence which "requires an additional inferential step to

17   demonstrate discrimination." *Coghlan v. Am. Seafoods Co. LLC*, 413 F.3d 1090, 1095

18   (9th Cir. 2005). "[V]ery little direct evidence of discriminatory motive is sufficient."

19   *Winarto v. Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276, 1284 (9th Cir. 2001)

20   (internal quotation omitted). But where circumstantial evidence is used, "a plaintiff must

21   put forward specific and substantial evidence challenging the credibility of the

22   employer's motives." *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003).

1    Straws provides emails between Eric Morse, the Chief Steward of her union,

2    Steven Martinsen, a Shipyard Resource Manager, and others about the scheduling of her

3    fitness-for-duty exam (which the Navy asserts were produced for the first time in

4    response to its motion). Dkt. 18-2 at 7–41. This evidence is neither specific nor

5    substantial. The email chain shows, at most, the Navy's realization that it could not pay

6    for Straws's outside physician. While the scheduling and rescheduling of the exam may

7    be frustrating and inefficient, the Navy's actions do not amount to pretext for

8    discrimination based on Straws's epilepsy. And Straws has not provided non-speculative

9    evidence or case law to support her pretext argument.

10    In sum, Straws has not established that the Navy's request for her to have a

11    fitness-for-duty exam was disability discrimination or pretext. Summary judgment is

12    therefore GRANTED, and Straws's disability discrimination claim is DISMISSED with

13    prejudice.

14   **C.    Retaliation Claim**

15    Retaliation claims under the Rehabilitation Act are subject to the burden-shifting

16    framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04

17    (1973). *Curley v. Cty. of N. Las Vegas*, 772 F.3d 629, 632 (9th Cir. 2014). Under that

18    framework, an employee challenging an adverse employment action has the initial burden

19    of establishing a prima facie case of retaliation. *Id.* The burden then shifts to the

20    employer to provide a legitimate, nonretaliatory reason for the adverse employment

21    action. *Id.* If the employer does so, then the burden shifts back to the employee to prove

22    that the reason given by the employer was pretextual. *Id.*

ORDER - 14

1    To show a prima facie case of disparate treatment under the Rehabilitation Act,

2    Straws must show: "(1) involvement in a protected activity, (2) an adverse employment

3    action, and (3) a causal link between the two." *Coons v. Sec'y of the U.S. Dep't of*

4    *Treasury*, 383 F.3d 879, 887 (9th Cir. 2004) (internal quotation omitted). Regarding the

5    adverse employment action, Straws must show that the complained-of action "materially"

6    affected a term of her employment. *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th

7    Cir. 2008). Regarding causation, Straws must show "that the unlawful retaliation would

8    not have occurred in the absence of the alleged wrongful action or actions of the

9    [defendant]." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013); *see also*

10   *T.B. ex rel. Brenneise v. San Diego Unified Sch. Dist.*, 806 F.3d 451, 473 (9th Cir. 2015)

11   (adopting the *Nassar* but-for causation standard for ADA retaliation claims).

12   Straws alleges that she engaged in protected activity by engaging in the EEO

13   process and that she suffered from numerous adverse employment actions. Dkt. 1,

14   ¶ 6.2–6.3. In her response, however, it appears that Straws is pursuing only her

15   allegations involving the 2018 fitness-for-duty exam. *See* Dkt 18 at 17–18. While the

16   Navy concedes that Straws engaged in protected activity by filing her EEO complaint and

17   participating in the EEO process, it argues that the fitness-for-duty exam is not an adverse

18   action and that there is no causal link between the two. Dkt. 12 at 18.

19   Fitness-for-duty exams have been found both to be an adverse action and to not be

20   an adverse action for a retaliation claim. *Compare Day v. United Parcel Serv., Inc.*, 829

21   F. Supp. 2d 969, 979 (D. Or. 2011) (denying summary judgment where alleged adverse

22   actions included taking a fitness-for-duty exam); *Richard v. U.S. Postal Serv.*, 219 F.

Supp. 2d 172, 182–83 (D.N.H. 2002) (finding close temporal proximity between protected activity and fitness-for-duty exam supported inference of adverse action) *with* *Semsroth v. Cty. of Wichita*, 548 F. Supp. 2d 1203, 1211 (D. Kan. 2008) (concluding fitness-for-duty exam by itself did not constitute adverse action and collecting cases holding the same). A fitness-for-duty exam's temporal proximity to the protected action and its impacts on employment appear to be the most important factors in considering whether the exam is an adverse action.

The Court concludes that Straws has not carried her burden in establishing a prima facie retaliatory claim as her claim relates to her allegation that the fitness-for-duty exam is an adverse employment action. *See* Dkt. 1, ¶ 6.3(d). Straws received her first fitness-for-duty exam letter on September 11, 2018 and submitted her EEO complaint on September 12, 2018. This temporal proximity does not support an inference of an adverse action. In *Richard*, for example, the court found persuasive a fitness-for-duty exam ordered in response to plaintiff's filing of a lawsuit. 219 F. Supp. 2d at 182 There, the adverse action occurred *after* the protected activity. *Id.* The inverse occurred here: Straws's protected activity occurred *after* the alleged adverse action. Furthermore, Straws has not presented any evidence of impacts on her employment with the Navy as a result of its scheduling her fitness-for-duty exam. Straws has not provided any authority to support her argument that the fitness-for-duty exam was an adverse action, nor has she

1    provided any argument about a causal link. She has thus failed to establish a prima facie

2    case under this theory.[4]

3          Straws also argues that the Navy's refusal to issue or allow its medical

4    professional employee(s) to issue a notice finding that she is fit for duty, resulting in her

5    records indicating that she needs to be evaluated, is an adverse action. Dkt. 1, ¶ 6.3(e).

6    Straws's meeting with Dr. Christensen occurred after she filed her EEO complaint and

7    engaged in EEO mediation, but this argument is again. It appears that the Navy

8    understood that Straws would file follow-up paperwork to complete the fitness-for-duty

9    exam, and Straws understood that the Navy would follow up with her. The Navy is not,

10   however, refusing to issue a notice that she is fit for duty, and, rather, her supervisor

11   understood her to be fit for duty. And most importantly, there have been no adverse

12   impacts on Straws's employment. Straws complains of a red folder that was placed in her

13   medical file, but she has not shown evidence that the folder has an effect or impact on her

14   employment. Straws has failed to establish a prima facie case under this theory as well.

15         Finally, Straws alleges that issuing a written notice accusing her of failing to

16   follow instructions, denying her application for a TDY assignment, knowingly submitting

17   false information during the EEO investigation as to the Navy's knowledge of her

18   epilepsy, and engaging in a hostile work environment are all adverse actions. Dkt. 1,

19   ¶ 6.3(a)–(c), (f). Straws has seemingly abandoned these allegations as she did not respond

20

---

21         [4] The Court notes that the Navy rescheduled Straws's fitness-for-duty exam after Straws
     filed her initial EEO complaint, but this timing alone does not support a prima facie case of an
22   adverse employment action or pretext for the reasons discussed in the previous section.

1    to the Navy's arguments on the issues. *See* Dkt. 21 at 11–12. A party's failure to respond

2    to a motion for summary judgment does not permit the court to grant the motion

3    automatically. *See Heinemann v. Satterberg*, 731 F.3d 914, 916 (9th Cir. 2013) ("[A]

4    motion for summary judgment may not be granted based on a failure to file an opposition

5    to the motion."). Rather, the court may only "grant summary judgment if the motion and

6    supporting materials—including the facts considered undisputed—show that the movant

7    is entitled to it." Fed. R. Civ. P. 56(e)(3); *see Heinemann*, 731 F.3d at 916. Straws has the

8    initial burden to show a prima facie case under the burden-shifting framework of a

9    retaliation claim and has failed to do so based on the enumerated allegations. Unverified

10   allegations contained in her complaint do not themselves create genuine disputes of

11   material fact. *See Moran v. Selig*, 447 F.3d 748, 759 (9th Cir. 2006). Straws has failed to

12   establish a prima facie case of retaliation based on these theories.

13           Therefore, the Navy's motion for summary judgment is GRANTED, and Straws's

14   retaliation claim is DISMISSED with prejudice.

15           In sum, Straws's claims are based upon an incomplete administrative process in

16   which Straws and the Navy both bear some fault, but ultimately was part of a legitimate

17   and regulatorily authorized process. The process and the Navy's actions here do not

18   amount to an adverse employment action.

19                                 **III.   ORDER**

20           Therefore, it is hereby **ORDERED** that Defendant the Navy's motion for

21   summary judgment, Dkt. 12, is **GRANTED**. All of Straws's claims against the Navy are

22   **DISMISSED with prejudice**.

The Clerk shall enter a **JUDGMENT** and close the case.

Dated this 27th day of October, 2021.

BENJAMIN H. SETTLE
United States District Judge